Rod Pacheco (State Bar No. 112432)
rpacheco@pncounsel.com
Brian Neach (State Bar No. 242801)
bneach@pncounsel.com
Chapman Brewer (State Bar No. 339414)
cbrewer@pncounsel.com
PACHECO & NEACH PC
Three Park Plaza, Suite 120
Irvine, California 92614
Telephone: 714.462.1700
Facsimile: 714.462.1785

Attorneys for EDWARD MIERAU and
NEFF CONSTRUCTION, INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### EASTERN DIVISION

| | |
|---|---|
| EDWARD MIERAU, as an individual; and NEFF CONSTRUCTION, INC. a California corporation. | Case No. |
| **Plaintiffs,** | **COMPLAINT FOR:** |
| vs. | 1. Violation of Civil Rights (42 U.S.C. § 1983) |
| RIVERSIDE COUNTY OFFICE OF EDUCATION, a California municipal entity; and DOES 1-10. | **JURY TRIAL DEMANDED** |
| **Defendants.** | |

COMPLAINT

Plaintiffs Edward Mierau ("Mr. Mierau") and Neff Construction, Inc. ("Neff") hereby bring suit against the Riverside County Office of Education ("RCOE") for violation of Plaintiffs' civil rights. Plaintiffs allege as follows:

## PRELIMINARY STATEMENT

1.      Plaintiff Edward Mierau's life was turned upside down when, in November 2019, he was charged with multiple felony counts alleging white collar crimes by the Riverside County District Attorney's Office ("RIVCODA").  Not only was his personal life thrown into disarray, but also the effects of the charges were disastrous on his business, plaintiff Neff Construction, Inc.

2.      The nightmare ended in July 2021, when the RIVCODA prosecutor walked into a courtroom and summarily dismissed all charges against Mr. Mierau. While completely vindicated and free from the threat of multiple years in state prison for crimes he did not commit, the damage had already been done.

3.      Through discovery obtained during the criminal proceedings against Mr. Mierau in 2020, Plaintiffs were shocked to learn that the criminal charges arose from false allegations and misrepresented reports by Michael Ammermon, a so-called "investigator" for the local agency known as the Fiscal Crisis and Management Assistance Team, or "FCMAT."

4.      Further information discovered over time revealed that Ammermon knew the information he was feeding to RIVCODA personnel was false and misleading.

5.      As Plaintiffs uncovered still more information, they learned that FCMAT and Ammermon were acting for defendant Riverside County Office of Education, or "RCOE."  RCOE had delegated its audit authority to FCMAT and its team, including Mr. Ammermon.  Under well-established principles of law regarding delegation of authority, RCOE is therefore responsible for the constitutional violations describe herein.

6.     As described further below, RCOE, through the actors described herein, violated the constitutional rights of Plaintiffs, including their rights under the Due Process Clause and the Equal Protection Clause to be free from malicious prosecution. In addition, several other of Plaintiffs' constitutional rights were violated, including their Fourth and Sixth Amendment rights.

## PARTIES

7.     Plaintiff Edward Mierau is, and at all relevant times was, a California resident.

8.     Plaintiff Neff Construction, Inc. is, and at all relevant times was, a California corporation authorized to do business in the State of California.

9.     Defendant Riverside County Office of Education ("RCOE") is, and at all relevant times was, a governmental municipal entity that operates in and around the county of Riverside.

10.    DOES 1-10 are unknown to Plaintiffs at the time of the filing of this complaint. Plaintiffs are informed and believe that both unknown individuals and entities were involved in the deprivation of Plaintiffs' civil rights as aiders and abettors, co-conspirators, or as agents. DOES 1-10 will be added as co-defendants when evidence and information allow Plaintiffs to adduce individuals' and entities' identity and liability.

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction over this action under 28 U.S.C. Section 1331 as the claims are brought pursuant to 42 U.S.C. Section 1983, a law of the United States.

12.    Venue is proper in this Court under 28 U.S.C. Section 1391(b)(1) as defendant RCOE conducts its operations in Riverside County and therefore is considered a resident of such County under 28 U.S.C. Section 1391(c)(2).

# GENERAL ALLEGATIONS

## *The Persons and Entities Involved*

13.     Defendant Riverside County Office of Education ("RCOE") is overseen by the Riverside County Superintendent of Schools. Defendant RCOE is the entity with statutory power under California Education Code § 1241.5(b) to audit the fiscal activities of any school within the County of Riverside for fraud, misappropriation of funds, or other illegal fiscal activities.

14.     On September 6, 2017, Defendant RCOE entered into the AB139 Study Agreement (the "Agreement") with FCMAT.  The Agreement delegated Defendant RCOE's statutory power under California Education Code § 1241.5(b) to FCMAT in its entirety. FCMAT had full control over auditing the Corona-Norco school district for fraud, misappropriation of funds, or other illegal fiscal activities.

15.     According to the contract between RCOE and FCMAT, Defendant RCOE did not participate in the audit discussed herein, reserved no audit power for itself, and was merely permitted to review and comment on a draft of the final report before publication by FCMAT.

16.     Because Defendant RCOE delegated its full audit authority to FCMAT, Defendant RCOE is liable for any Constitutional violations that result from the audit and conduct related to it.

17.     FCMAT is a governmental entity created by the Legislature in 1991 ostensibly to assist local school districts in their fiscal matters and issues. Over the years FCMAT has increased in responsibility while maintaining its original charge.

18.     FCMAT charges local school districts for its audit services. Those monetary charges are set out in contracts FCMAT creates with local districts.

19.     FCMAT is governed by the Kern County Superintendent of Schools. FCMAT policies are established by a Board of Directors that includes local elected and appointed officials, including County Superintendents from Riverside, Lake, Placer, Glenn, Marin, Calaveras, Santa Clara, Madera, San Diego, Los Angeles, and

Santa Barbara counties. Local District Superintendents from a variety of school districts throughout the state of California also serve on the Board.

20.     FCMAT is not a law enforcement agency nor does it engage in criminal investigations, according to its charter and its own website.

21.     Michael Fine is, and has been, the Chief Executive Officer of FCMAT since July 1, 2017, to present day. Fine also serves as the FCMAT Representative on the FCMAT Board of Directors.

22.     Michael Ammermon is, and has been, an employee of FCMAT since 2017 and serves as an Intervention Specialist.

23.     Prior to being hired as an employee, Ammermon worked as a consultant for FCMAT as an independent contractor between 2012 and 2017.

24.     Ammermon is a certified public accountant and has described himself as a certified fraud examiner with forensic training and designation by the American Board of Forensic Accounting.

25.     Plaintiffs are informed and believe that Ammermon is not a law enforcement officer, has never been a law enforcement officer and has no law enforcement training of any kind including investigative training.

26.     Plaintiffs are informed and believe that Fine also lacks any experience or training in law enforcement investigations.

27.     Plaintiff Mierau is the Chief Executive Officer and majority shareholder of Neff. Plaintiff Neff is a construction firm located in San Bernardino County that provides a variety of significant construction services on multi-million-dollar projects throughout California. Neff specializes in school construction and has been doing so for decades, and prior to the damage done by Defendant RCOE, enjoyed a universally positive and respected reputation statewide in the school construction industry.

28.     Corona-Norco School District ("CNUSD") covers the geographical area of the cities of Corona and Norco and provides education to children from kindergarten through 12th grade.

### ***The Beginning***

29.    In August 2017 two high ranking personnel with CNUSD, Lynne Murray and Nancy Baker, spoke to the Riverside Sheriff's Office ("RSO") regarding their suspicions that the Facilities Director for CNUSD, Ted Rozzi, was possibly embezzling funds from the district. Murray had been mentioning her suspicions to school district personnel since 2009-10, but those complaints, according to Murray, had been routinely ignored. Prior to 2017 no one from CNUSD, including Murray, had ever reported her suspicions of Ted Rozzi to law enforcement.

30.    Shortly thereafter, RSO responded and began an investigation into the allegations.

31.    The allegations included that Mr. Rozzi was utilizing the change order process in numerous school construction projects to secure checks to various banks under the premise that there were legitimate reasons for the checks. It is common for school district personnel across California to request checks from their contractors on school construction projects for various costs or expenses of the school districts. Those requests are then processed through the construction company as change orders and must meet with district review and approval, with final approval coming much later from the school district superintendent and ratification by the elected school board.

32.    Pursuant to all CNUSD school construction projects a contract existed between the main contractor and the district. That contract required the construction company to obey the commands of the district through its Facilities Director, the individual in control of school construction within the district. Failure to comply with the directive of the Facilities Director could result in termination of the contract according to the contract. Given that the contracts included the construction of high schools, some of the contracts exceeded $100 million dollars, thus the consequences of contract termination for a private construction company employing hundreds of employees could be enormous.

COMPLAINT

33.     Without pertinent knowledge of the school construction process, RSO quickly focused on checks Rozzi requested and received from Neff which were requested via emails from Rozzi to Mr. Mierau and then processed with change order forms in various school projects from which Rozzi directed they should come. All funds requested by Rozzi in his emails were monies advanced by Neff and were not funds entrusted to Neff by the school district, thus the change orders eventually processed were essentially reimbursements to Neff.

34.     Neff change order forms directed by Rozzi were all prepared openly and transparently and went through an extensive approval process that required signed approval not only from the Neff manager for the project Rozzi identified in his emails, but also the project manager from CNUSD, the architect who was independently hired by CNUSD, the district superintendent and the elected school board. No change order could be paid, nor was paid by CNUSD that was not approved by all identified herein. Every demand made by Rozzi of Neff was approved and paid by CNUSD.

35.     In November 2017 RSO Detective Barros complained, in writing, that his investigation into the issues at CNUSD had hit a "dead end." Plaintiffs are informed and believe that communication was shared with Ammermon, who had been assigned the CNUSD audit on behalf of FCMAT.

### *The FCMAT and CNUSD Agreement for Examination of CNUSD*

36.     On information and belief, on or around September 2017 the Riverside County Superintendent of Schools, who controls and operates Defendant RCOE, determined that CNUSD personnel may have been involved in unlawful activity based on the RSO investigation.

37.     As a result of its determination, Defendant RCOE entered into a contract with FCMAT for what is known as an AB 139 review of CNUSD that focused on two aspects: (1) determining whether adequate management controls were in place regarding CNUSD's procurement activities and contractual commitments relative to facilities maintenance and/or construction projects; and (2) reviewing project

1  documentation and transactions for projects initiated and/or overlapping into fiscal
2  years 2012-13 through 2017-18 for the purposes of identifying fraud,
3  misappropriation of funds, or other illegal fiscal activities.

4      38.    AB 139 review refers to Assembly Bill 139, which passed the California
5  State Legislature and was signed into law in 2001. AB 139 empowered county
6  superintendents of schools to perform various fiscal activities including but not
7  limited to an audit or review of a local school district if a district's fiscal practices
8  may involve unlawful activity.

9      39.    AB 139 requires that the FCMAT audit be performed pursuant to
10  Education Code Section 1241.5(b).

11      40.    Due to the contractual relationship FCMAT was an agent of the local
12  municipality, Defendant RCOE.

13      41.    California Education Code § 1241.5(b) grants County Superintendents
14  final decision-making authority in the area of auditing schools within their counties
15  for fraud, misappropriation of funds, or other illegal fiscal activities.

16      42.    Defendant RCOE delegated its full audit authority under Education Code
17  1241.5(b) to FCMAT under the contract.

18      43.    The contract between RCOE and FCMAT did not encompass any
19  investigation of Neff, Mr. Mierau or Neff's personnel, or any private parties.

20      44.    Nowhere in FCMAT's contract, or in any addenda, is there language that
21  mentions, references, or encourages FCMAT, Ammermon, or Fine to work for, direct,
22  lead, instigate, aid or abet law enforcement's separate criminal investigation.
23  Consequently, public monies paid by Defendant RCOE were for the sole purpose of
24  auditing CNUSD's fiscal practices during a particular six-year time frame.

25      45.    The contract and addenda memorialized an exchange of services to be
26  provided by FCMAT personnel for monies—public monies—to be paid by Defendant
27  RCOE.

28

46.     FCMAT began its audit in late September 2017 when the agreement was signed. The cost for FCMAT services was set at $38,500 and no more. Fine signed the agreement which identified the proposed cost of the audit and the personnel FCMAT would requisition for the audit.

47.     It was the standard practice for FCMAT to appoint at least two auditors on every audit FCMAT performed. Plaintiffs are informed and believe that best practices for the accounting profession encourages two auditors on any audit so biases, interests and conscious or subconscious motives do not affect the audit.

48.     Two auditors, Ammermon and Mr. Smith, were initially assigned by FCMAT to perform the audit of CNUSD. However, Mr. Smith left the assignment almost immediately after his assignment, in approximately December 2017. No other consultant was ever assigned by FCMAT to ensure Ammermon's bias, interest or improper motives were checked or restrained. He was free to act as he desired and file whatever final report he thought he could get away with, or that Fine would approve. Consequently, the field work was done exclusively by Ammermon.

49.     In early 2019 FCMAT was well over budget in an audit that had lasted, at that point, eighteen (18) months. FCMAT therefore demanded more public money from Defendant RCOE for its audit. In February 2019, FCMAT, the fiscal watchdog hired by Defendant RCOE to audit the fiscal management controls of CNUSD, had exceeded its own fiscal management limits by over $30,000, almost double the amount Fine had represented his audit would cost taxpayers.

50.     When asked by FCMAT's Deputy Chief Executive Officer Michelle Giacomini how much more taxpayer monies FCMAT should demand from Defendant RCOE for its audit, Ammermon stated that it should be increased two and half times the original cost of $38,500.

51.     Ammermon attributed the increased cost to his work for the Riverside County District Attorney's Office ("RIVCODA") investigating Neff and Mr. Mierau,

though he had no authority to charge a public entity for work that was not part of the contract.

52.     Ammermon claimed in February 2019 that he was "ending field work," though he did conduct more work for RIVCODA and on finalizing his report.

53.     By May 2019, Ammermon and Fine claimed they had finished their report of findings regarding CNUSD fiscal practices, a standard practice for FCMAT. Yet FCMAT continued to bill on the contract with Defendant RCOE until April 2020, almost one full year after they had concluded their work, according to internal memoranda.

54.     Though he had earlier claimed he had ended his field work on the matter in February 2019, and the draft report was finished in May 2019, Ammermon continued to bill Defendant RCOE for what he described as "field work" throughout 2019 and into April 2020.

### *FCMAT's examination and entanglement with and dominance of law enforcement*

55.     On December 15, 2017, RSO served a search warrant on Neff securing copies and images of Neff computers.

56.     RSO and RIVCODA personnel had been in communication with Neff legal counsel throughout the end of 2017 and up to the present day, including during the service of the RSO search warrant in December 2017. It was during those interactions that RSO and RIVCODA were informed that they would need consent before the interview of any witnesses from Neff including Mr. Mierau. Consequently, all civil rights pertaining to the Fifth and Sixth Amendments to the U.S. Constitution were established and communicated to RSO and RIVCODA in late 2017.

57.     Plaintiffs are informed and believe that Ammermon subverted and violated the civil rights of Mr. Mierau and other Neff personnel in January of 2018 when he approached Mr. Mierau directly via email as an agent of law enforcement. Plaintiffs are further informed and believe that FCMAT, RSO and RIVCODA

conspired to violate Mr. Mierau's and Neff's Fourth, Fifth and Sixth Amendment rights when law enforcement was required to secure the permission of legal counsel before contacting and or interviewing Neff personnel represented by counsel.

58.     In his first communication with Mr. Mierau in January 2018, Ammermon requested an appointment with Mr. Mierau. Ammermon informed Mr. Mierau that Neff had been selected, along with other vendors, for a random audit. Ammermon made it clear in his message to Mr. Mierau that he wanted to interview Mr. Mierau and review records of Neff. Neff is a private company and had no obligation to submit to an audit from FCMAT, though Mr. Mierau agreed to meet.

59.     At that appointment Ammermon immediately objected to the presence of legal counsel for Neff and stated unequivocally that he would not speak with anyone unless legal counsel left the room and was not present for his interview of Mr. Mierau and others.

60.     Ammermon made this demand upon being introduced to legal counsel. Upon questioning, Ammermon could not explain or provide any authority or justification for his demand that counsel be removed from the room. When his demand went unfulfilled, Ammermon began interviewing Neff personnel present, including but not limited to Mr., Mierau. During the interview Ammermon was asked to explain his authority to investigate Neff and its personnel, given that his charge was an examination of a school district's fiscal policies and practices, not private citizens.

61.     Again, Ammermon could not explain or provide any legal authority other than the standard contract language between CNUSD and Neff which allowed for the school district, not third parties such as FCMAT, to secure confidential records from Neff upon request. When it was pointed out to him that neither he nor the entity he represented, FCMAT, was a party to the contracts and therefore could not access the records he became very demanding, and grew visibly angry.

62.     Despite Ammermon's antisocial behavior, Neff personnel did agree to review any requests of Ammermon to see if by law and its contract with CNUSD,

which required confidentiality, Neff could provide some records. Subsequently, it was determined by legal counsel that the contracts between CNUSD and Neff prohibited providing records from Neff to private third parties. CNUSD legal counsel also agreed, in writing, with this legal conclusion.

63.     Ammermon subsequently immersed himself in investigating Neff, and not so much CNUSD.

64.     At one early point Ammermon was identified by RSO Detective Barros as the "Neff investigator" and that he, Barros, was investigating Mr. Rozzi. This was done in writing and provided to other law enforcement partners announcing Ammermon's status in the investigation, amongst other things.

65.     Ammermon almost immediately began interviewing witnesses in the criminal investigation. RIVCODA Investigator Doyle ("Doyle") would typically accompany Ammermon on the witness interviews but would maintain a secondary position in the interviews letting Ammermon serve as lead "investigator." Doyle is a Senior Investigator with RIVCODA and has been assigned to the "Public Integrity" Unit for RIVCODA for some time. The alleged purpose of RIVCODA's "Public Integrity" Unit is to investigate misrepresentations, fraud, and corruption.

66.     In one instance several architects who had approved Rozzi's requests for checks for purported school projects were to be interviewed. As was their custom, Ammermon and Doyle colluded with each other ahead of the interviews. In their email communications they agreed that Ammermon would lead the interviews and Doyle would be introduced as a "colleague" of Ammermon's with FCMAT. Doyle's real identity would be fraudulently concealed, and the architects would be lied to by Ammermon and Doyle. At the onset of the interview both Ammermon and Doyle lied about Doyle's identity as they had planned. During the interview Doyle was indeed introduced to the witnesses as a colleague of Ammermon's at FCMAT. At no time were the witnesses told the truth.

67.     It has long been established that governmental authority may dominate

an activity to such an extent that its participants must be deemed to act with the authority of the government and, as a result, be subject to constitutional constraints. Edmonson v. Leesville Concrete Co., 500 U.S. 614, 620 (1991). By colluding with RSO and RIVCODA, by Doyle's involvement and subordination to Ammermon during interviews, and by Doyle allowing Ammermon to direct the "Neff investigation," Ammermon acted under color of authority in demanding an interview with Mr. Mierau and demanding that Mr. Mierau turn over confidential and protected business documents. In essence, Ammermon was an agent of law enforcement and thus was constrained by the state and federal constitutions as any law enforcement officer would have been. Ammermon's demand to interview Mr. Mierau without legal counsel present was in clear violation of Mr. Mierau's Fifth Amendment rights, and the demand that Mr. Mierau turn over Neff documents – which Ammermon then intended to share with RSO and RIVCODA – is a clear violation of Mr. Mierau's Fourth Amendment rights.

68. When Ammermon was not interviewing witnesses as the "Neff Investigator" he was instructing and directing Doyle on how to conduct Doyle's investigation. Ammermon's instructions included providing witness questions for Doyle, directing what documents to seek and other critical parts of Doyle's purported work.

69. It is highly unusual, if not unheard of, for law enforcement agencies and personnel to provide unfettered access to confidential investigations, especially those that involve public corruption, to private citizens who are not law enforcement. It is even more unusual for RSO to give a private citizen documents from their service of a search warrant. Further disturbing irregularities included the allowance of Ammermon to participate in witness interviews during the investigation and for him to lead those interviews.

70. Ammermon made every effort to secure the Neff records that the law, confidentiality and contractual agreements had previously prevented he receive. In

one communication from Barros, in writing and addressed to Doyle and personnel with the Computer and Technology Crime High Tech Response Team, known as "CATCH," Barros arranged for Ammermon to receive a multitude of confidential and privileged documents seized from Neff.

71.    CATCH is a multi-agency task force operated and controlled by two primary law enforcement entities, RSO and RIVCODA. Its purpose is to facilitate investigations that need IT or high-tech computer assistance. The search warrant of Neff necessitated the services of CATCH. Also, at the time of the search warrant in December 2017, both agencies, RSO and RIVCODA, were actively investigating the allegations surrounding CNUSD.

72.    The purpose of Barros' email to Doyle and CATCH was to inform the CATCH personnel that RSO and RIVCODA approved of a complete transfer of all computer records seized from Neff during the search warrant, to Ammermon and FCMAT.

73.    At no time did RSO, RIVCODA or FCMAT advise, or seek the permission of, Neff, any of its personnel or counsel for Neff that FCMAT and its personnel would begin reviewing confidential trade secrets of Neff, privileged communications and other confidential information protected by the California and federal constitutions.

### ***Defendants' violation of attorney-client Privilege and the Fifth and Sixth Amendment Right to Counsel.***

74.    Contained within the Neff computer records were numerous confidential attorney-client privileged communications between Neff personnel, including Mr. Mierau, and their legal counsel, Rod Pacheco. All of these email communications were protected by the attorney-client privilege and should not have been reviewed by anyone according to law, particularly private citizens.

75.    As the emails of Mr. Mierau were under great scrutiny by law enforcement in their investigation, Plaintiffs are informed and believe that

Ammermon reviewed these privileged communications thus violating the Sixth Amendment right to counsel of Mr. Mierau and his attorney-client privilege. The review of attorney-client privileged documents also constituted a violation of Mr. Mierau's and Neff's rights under the Fourth Amendment to the United States Constitution.

76. At no time since his access was provided to the confidential records of Neff and the privileged communications with Mr. Mierau, did Ammermon, Fine or FCMAT ever notify Mr. Mierau's legal counsel, Neff or Mr. Mierau that these confidential documents were in FCMAT's possession.

77. By June 2019, FCMAT, Ammermon and Fine had concluded their audit for which they contracted with RCOE.

78. Though Ammermon and Fine had been done with the FCMAT audit report many months earlier, Ammermon and Fine conspired to date the report months later to intentionally coincide with RIVCODA personnel's actions and collude with RIVCODA Deputy District Attorney David Allen ("Allen").

79. On November 5, 2019, RIVCODA, led by prosecutor Allen, filed in Riverside Superior Court numerous felony charges against Mr. Mierau in the form of a Complaint.

80. One day later, on November 6, 2019 FCMAT released the Report.

81. Prior to the filing of charges and the release of the Report prosecutor Allen and Ammermon conspired to file both documents, the Complaint and the Report, at the same time as revealed in an email between the two discovered much later. FCMAT and RIVCODA personnel did so, Plaintiffs are informed and believe, to maximize negative publicity against Mr. Mierau and Neff.

### _The FCMAT Report, its Fallacies, Inaccuracies, and Outright Falsehoods prepared by Ammermon and Reviewed and Approved by Fine_

82. The Report, seventy-eight (78) pages in all, publicly was released and placed on the internet for wide public exposure. As one might expect it reverberated

throughout the school construction industry.

83.     The Report begins with a letter from Fine stating that the Report represents the "study team's findings." Subsequently it was learned that the "study team" was Ammermon overseen by Fine. From the beginning, the Report was misleading, suggesting that there were a multitude of analysts who painstakingly compiled the information and came to well-reasoned conclusions. The opposite was true.

84.     The Report spent much more time accusing Neff personnel, particularly Mr. Mierau, of wrongdoing rather than examining the practices of CNUSD, for which FCMAT was contractually required to investigate and for which it was paid. Instead, Ammermon, with Fine's full knowledge and approval, filed a public report accusing Mr. Mierau of malfeasance, severely damaging Neff, its existing contracts, and contracts it attempted subsequently to secure.

85.     As Plaintiffs would later find out, Ammermon purposely concealed information from his Report and made numerous false and misleading statements therein in an effort to cause a malicious prosecution of Mr. Mierau and Neff. There are many examples of this behavior a few of which are as follows.

86.     As previously stated, the activities by Rozzi involved the change order process. Ammermon purposely excluded, or severely downplayed the fact that change orders for vendor payments requested by school districts are common and not unusual. Ammermon had acquired this knowledge when he interviewed individuals involved in the process who explicitly told him that change orders for vendor payments was customary and routine practice in the school construction industry. He gained this knowledge from personnel from Neff, architects involved in the process and others, and he knew it before he filed his Report.

87.     Further, Ammermon knew that every change order requested by Rozzi that was the subject of the investigation had been approved by a variety of persons involved in the process, including but not limited to: project managers for CNUSD;

architects hired independently by CNUSD; the School Superintendent; and the CNUSD School Board. Ammermon and Fine knew this information and concealed it from their public Report.

88.    Fine and Ammermon also knew that neither Neff nor Mr. Mierau had made any profits from Mr. Rozzi's actions and in fact all the change orders in question involved nothing more than reimbursement to Neff on monies advanced at the demand of the Facilities director. Ammermon and Fine knew this information and concealed it from their public Report.

89.    Ammermon and Fine knew that all CNUSD contracts mandated in writing that Neff and its personnel, including but not limited to Mr. Mierau, obey the directives of the Facilities Director and that failure to follow his directives could result in termination of the contract. Ammermon and Fine knew this information and concealed it from their public Report.

90.    Ammermon reported and Fine approved of false statements that Neff, and impliedly Mr. Mierau, purposely delayed asking for reimbursements from CNUSD in the change order process in an effort to conceal wrongdoing. Ammermon alleged that Neff's intentional delays amounted to numerous months and almost a year on occasion. Ammermon knew this was false as he was in unique possession of all of Neff's computer records and the records from the change order process. Those records reveal that—in all instances of Rozzi sending directives for checks in the change order process to Neff, and Mr. Mierau—the process was instituted immediately and took no longer than a little short of two weeks at the latest for Neff to process its change orders and submit them, with CNUSD approval by architects and CNUSD project managers, to CNUSD. The most cursory review of the records reveals the dates of those documents and the dates of the various approvals including CNUSD managers. The delay was in the processing of reimbursements pursuant to those change orders, by CNUSD. In all instances the many months of delay were solely attributable to the slow process of Superintendent and School District Board

approvals and final payment. Given he is a CPA and a certified fraud examiner, it could not be that Ammermon was unable to understand the documents upon which his analysis was based; it could only be that he read them and intentionally lied about what they revealed.

91.    One of the most salacious and false references in the Report—made clearly to draw a false conclusion by the reader that Mr. Mierau was guilty of embezzlement of an amount well over $2 million—was Fine and Ammermon's attempt to claim a friendly relationship between Rozzi and Mr. Mierau. Ammermon and Fine's attempts at identifying "evidence" of criminality included a belief that Mr. Rozzi and Mr. Mierau knew each other's wives' first names. Thus, if one knows another person's wife's name, they must be guilty of numerous felonies, or so went Fine and Ammermon's reasoning. Fine and Ammermon further claimed, falsely, that Mr. Mierau and Rozzi had vacationed together. They knew this was false but posited it in their Report anyway in an attempt to savage Mr. Mierau's reputation and provide a basis for filing numerous criminal charges against Mr. Mierau. As astonishing as a reliance by experienced prosecutors on such "evidence" for the filing of almost thirty separate felonies against Mr. Mierau, it is in fact true that prosecutors did rely on the "wives' names" evidence as a basis for filing charges.

92.    Ammermon further grossly distorted the amount of monies that were allegedly embezzled by Rozzi, and at the time he knew of his own personal knowledge that his representation in the Report was abjectly false.

93.    As an auditor for FCMAT, a CPA and a Forensic Fraud Examiner, Ammermon had numerous ethical responsibilities in reviewing, analyzing, and reporting the purported loss of public funds. During Ammermon's financial analysis he failed to follow most of them.

94.    Ammermon reported on November 6, 2019, that the embezzled funds totaled $2,638,636.82. At the time Ammermon was drafting the Report and before finalization, Ammermon knew that this figure was false, as he had been provided

information from several sources that the figure was false. In fact, as Plaintiffs would later find out, Fine warned Ammermon against including the figure in the Report but Ammermon convinced him otherwise and Fine, knowing the figure was unreliable and untrustworthy and would be included in a public report that would excoriate the reputation of Mr. Mierau and of Neff, approved of its inclusion anyway.

95.    Ammermon and Fine falsely claimed that Neff and Mr. Mierau had failed to cooperate with CNUSD in the investigation. At the time Ammermon and Fine reported this allegation Fine knew it to be false, and that in fact Neff had immediately provided numerous documents concerning Rozzi's emails in August 2017 when the allegations first came to light. Ammermon and Fine knew this to be true and had in fact been told in early 2018 of the documents provided to CNUSD by Neff and Mr. Mierau. Nowhere in their Report did FCMAT report these facts and concealment of them cast a false and misleading light on Mr. Mierau and Neff.

96.    Further, counsel for Neff and Mr. Mierau had provided significant information from August 2017 through and including 2019. Counsel had met on numerous occasions with RSO Detective Barros and with RIVCODA personnel at some of its highest levels. During those meetings documents were provided, information was given, questions were answered. And as a result of one discussion 60,000 pages of documents were provided to RIVCODA in 2018 for their review. Nowhere in their Report did FCMAT report these facts and concealment of them cast a false and misleading light on Mr. Mierau and Neff. Moreover, the cooperation and documents provided were in direct contrast to the lie told by Ammermon, Fine and FCMAT in the Report.

97.    Defendant RCOE, by delegating their final audit authority under California Education Code § 1241.5(b) to FCMAT via the AB139 Study Agreement, is liable under 42 U.S.C. § 1983 for any constitutional violations committed by Ammermon and Fine in the course of the audit.

98.   Defendant RCOE, by reviewing a draft of the final Report—which included FCMAT's findings and the basis for those findings—before the Report was published, and later publishing the Report on Defendant RCOE's website, ratified Ammermon and Fine's conduct in violating Mr. Mierau's constitutional rights. Defendant RCOE is therefore liable under 42 U.S.C. § 1983 for any constitutional violations committed by FCMAT, Ammermon and Fine in the course of the audit.

### ***Defendants' Violations of Plaintiffs' Constitutional Rights***

99.   Defendants' conduct violated Plaintiffs' constitutional rights in several respects, including the violations of their Fourth, Fifth and Sixth Amendment rights as described above.

100.   Further, the right to hold specific private employment and to follow a chosen profession free from unreasonable governmental interference comes within the "liberty" and "property" concepts of the Fifth Amendment. Dent v. State of West Virginia, 129 U.S. 114, 128 (1889); Truax v. Raich, 239 U.S. 33, 41 (1915); Greene v. McElroy, 360 U.S. 474, 492 (1959). By knowingly engaging in the improper conduct described herein, Defendants caused substantial damages to Plaintiffs. Defendant RCOE is liable for the constitutional violations committed by Ammermon and Fine under 42 U.S.C. § 1983 through the doctrines of delegation and ratification.

101.   Prior to the conduct perpetrated by Defendants, Plaintiffs Neff Construction and Mr. Mierau ran a successful business providing major construction services for over forty (40) years throughout California, specializing in school construction. The school construction industry is a small, close community that has its own unique manner of disbursement of information, which is done quickly. Neff's routine projects included all sizes of school construction from small elementary schools that cost tens of millions of dollars to build as well as high schools that routinely exceeded $150 million dollars to construct, if not more.

102.   The reputation of a private company like Neff, and of its CEO, like Mr. Mierau, are critical for credibility in applying for these projects on a competitive basis

COMPLAINT

1  with many other companies. Over forty years, Neff had become a statewide leader in

2  constructing schools due to its impeccable reputation and that of its CEO, Mr. Mierau.

3  Damage to those reputations can be, and have been, devastating.

4      103.   As a result of the actions by FCMAT and imputed onto Defendant RCOE

5  through the delegation and ratification theories of municipal liability under 42 U.S.C.

6  § 1983, Mr. Mierau and Neff have lost well over $100 million in construction jobs

7  and opportunities. Defendants' conduct has severely impacted Plaintiffs' ability and

8  right to practice his chosen profession in violation of Plaintiffs' Equal Protection and

9  Due Process rights under the Fourteenth Amendment and the "liberty" and "property"

10  concepts of the Fifth Amendment.

11          ***RCOE delegated their audit authority to FCMAT***

12      104.   Municipal officials who have "final policymaking authority" may by

13  their actions subject the government to § 1983 liability. Pembaur v. City of Cincinnati,

14  475 U.S. 469, 483 (1986); City of St. Louis v. Praprotnik, 485 U.S. 112, 123 (1988).

15  Whether an individual or entity has final decision-making authority is a matter of state

16  law.    Pembaur, 475 U.S. at 483; Praprotnik, 485 U.S. at 123; Jett v. Dallas Indep.

17  Sch. Dist., 491 U.S. 701, 737 (1989); Christie v. Iopa, 176 F.3d 1231, 1235 (9th Cir.

18  1999). California Education Code §1241.5(b) establishes county superintendents'

19  authority to review or audit the expenditures of school districts in their respective

20  county. Under California law, the County Superintendent is the final decision-maker

21  in the area of auditing schools within the Superintendent's county for fraud,

22  misappropriation of funds, or other illegal fiscal activities.

23      105.   Judy D. White was the County Superintendent for the County of

24  Riverside from 2017 through and including November 1, 2020. By California statute,

25  White is the final decisionmaker for purposes of 42 U.S.C. § 1983 in the area of

26  auditing schools within the Corona-Norco school district for fraud, misappropriation

27  of funds, or other illegal fiscal activities.

28

106.   Defendant RCOE is the office of the Riverside County Superintendent and acted with White's full authority.

107.   On October 9, 2017, White entered into the Agreement with FCMAT on behalf of Defendant RCOE. The terms of the Agreement grant FCMAT all the powers reserved for the county Superintendent under Education Code § 1241.5(b) including the authority to audit schools within the district for fraud, misappropriation of funds, or other illegal fiscal activities.

108.   A municipality is liable for the constitutional violations of its subordinates where an official policymaker either delegated policymaking authority to the subordinate or ratified the subordinate's decision by approving the decision and the basis for it. <u>Praprotnik</u>, 485 U.S. at 126–27 (1988); <u>Fuller v. City of Oakland</u>, 47 F.3d 1522, 1535 (9th Cir.1995); <u>Hyland v. Wonder</u>, 117 F.3d 405, 414 (9th Cir.), <u>opinion amended on denial of reh'g</u>, 127 F.3d 1135 (9th Cir. 1997); <u>Gordon v. Cty. of Orange</u>, 6 F.4th 961, 974 (9th Cir. 2021). Defendant RCOE delegated its full audit authority to FCMAT under the Agreement and is therefore liable for constitutional violations committed by FCMAT and FCMAT's agents during the audit.

109.   A municipality is not insulated from civil liability by the act of delegating its decision-making authority. <u>Harman v. City & Cty. of San Francisco</u>, 158 Cal. App. 4th 407, (2007); <u>Praprotnik</u>, 485 U.S. at 126. Defendant RCOE, by the act of delegating audit authority to FCMAT, remains liable for constitutional violations caused by FCMAT's audit.

110.   Defendant RCOE did not reserve any audit authority for itself or conduct any part of the audit. The Agreement states that FCMAT's services shall be within FCMAT's sole control and discretion. Defendant RCOE delegated its full decision-making authority to FCMAT and is therefore liable under 42 U.S.C. § 1983 for any constitutional violations caused by FCMAT's audit.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### *RCOE ratified the Report drafted by FCMAT*

111.   Defendant RCOE hired FCMAT to perform duties granted by statute to Defendant RCOE i.e., audit the Corona-Norco Unified School District for fraud, misappropriation of funds, or other illegal activities.

112.   The only power reserved for Defendant RCOE under the Agreement was a "review and comment" service in which FCMAT would show Defendant RCOE the draft version of the Report and Defendant RCOE could "comment regarding the accuracy of the data presented or the practicability of the recommendations." AB139 Study Agreement, page 4.

113.   It is well established that an entity with final policymaking authority ratifies the decision of its subordinate by approving of the subordinate's decision and the basis for that decision. Praprotnik, 485 U.S. at 126–27; Fuller, 47 F.3d at 1535; Hyland, 117 F.3d at 414; Gordon, 6 F.4th at 974. This ratification opens the municipality up to liability for any constitutional violations that result from the ratified behavior. Here, before FCMAT published the Report, Defendant RCOE had an opportunity to review and comment on FCMAT's findings and the underlying data which forms the basis for FCMAT's recommendations. Defendant RCOE allowed FCMAT to publish the Report, thereby ratifying FCMAT's findings and the conduct that led to those purported findings.

114.   Defendant RCOE further ratified FCMAT's findings by publishing the Report, including the bases for FCMAT's findings, on Defendant RCOE's website. Defendant RCOE, by ratifying the Report in full, is liable under 42 U.S.C. § 1983 for any Constitutional violations that resulted from FCMAT's audit of the Corona-Norco School District.

**FIRST CAUSE OF ACTION**

**(Violation of Civil Rights pursuant to 42 U.S.C. §1983 (By Plaintiffs against RCOE)**

115.   Plaintiffs reallege and replead each and every allegation contained in paragraphs 1 through and 114, above, and by this reference incorporates the same herein and make each a part hereof.

116.   This action at law for money damages arises under 42 U.S.C. § 1983 and the United States Constitution to redress a deprivation under color of state law of rights, privileges and immunities secured to Plaintiffs by said statutes, and by the Fourth, Fifth, Sixth and Fourteenth Amendments of the United States Constitution.

117.   A municipality is liable under 42 U.S.C. § 1983 for constitutional violations committed by those to whom the municipality has delegated final policymaking authority.

118.   Defendant RCOE delegated its audit powers as established under California Education Code § 1241.5(b) to FCMAT when Defendant RCOE and FCMAT entered into the AB139 Study Agreement ("the Agreement") on October 9, 2017.

119.   Since late 2017 through and including all of 2019, FCMAT tolerated, encouraged, and participated in a clear pattern of unethical and unlawful behavior through its agents Ammermon and Fine, particularly as it related to Plaintiffs and the deprivation of their civil rights.

120.   Defendant RCOE's delegation of audit power resulted in the deprivation of Plaintiffs' civil rights as described herein.

121.   The behavior of FCMAT, and therefore RCOE, has illustrated a deliberate indifference to the fact that such inaction on its part would naturally result in a violation of due process rights under the Fourteenth Amendment and other constitutional rights afforded citizens pursuant to the U.S. Constitution.

122.   Plaintiff Mierau suffered from violations of his constitutional rights that caused him, among other things, significant reputational damage. In addition, Neff's business suffered the loss of numerous projects and business opportunities in an amount well over $100 million due to Defendants' conduct, thus causing damages to Neff and inhibiting Mr. Mierau's ability to practice his chosen profession in violation of his Fourteenth Amendment right to Due Process and Equal Protection under the law.

123.   Due to Defendants' acts and omissions, Plaintiffs were required to hire numerous legal counsel to fight the criminal and administrative investigations promulgated, inspired and created by Defendants and their agents. Consequently, Plaintiffs are indebted and liable for huge amounts of attorney's fees.

124.   By the conduct alleged herein, Defendants initiated and caused a malicious prosecution of Plaintiff Mierau in violation of his rights under the Due Process and Equal Protection Clauses of the United States Constitution.

125.   Defendant RCOE's delegation of audit authority does not shield RCOE from liability under 42 U.S.C. § 1983; Defendant RCOE remains liable for any constitutional violations that result from the delegation of Defendant RCOE's audit authority to FCMAT.

126.   Plaintiffs therefore pray for recovery of attorney's fees, expenses and costs pursuant to the provisions of 42 U.S.C. §§1983, et seq.

### PRAYER FOR RELIEF

WHEREFORE Plaintiffs pray for judgement against Defendants and each of them, as follows:

1. For Compensatory damages in the amount of at least $100 million and any additional damages to be proven at trial;

2. For Equitable Relief according to proof and that may be necessary;

3.  For Attorneys' fees under 42 U.S.C. § 1988;

4.  For Costs of the suit;

5.  For such other and further relief as the Court may deem proper.

  Plaintiffs hereby demand a jury trial.

DATED: January 14, 2022          PACHECO & NEACH PC

                              By: _____
                                   Rod Pacheco
                                   Brian Neach
                                   Chapman Brewer
                                   Attorneys for EDWARD MIERAU and NEFF
                                   CONSTRUCTION, INC.

25
COMPLAINT